DONALD M. MOSLEY, INDIVIDUALLY, APPELLANT/CROSS-RESPONDENT, *v.* TERRY MARIE FIGLIUZZI, RESPONDENT/CROSS-APPELLANT.

No. 26516

January 3, 1997                                    930 P.2d 1110

---

[Rehearing denied August 20, 1997]

*Carl E. Lovell,* Las Vegas; *Jimmerson, Davis & Santoro,* Las Vegas, for Appellant/Cross-Respondent.

*Beasley, Holden & Kern,* Reno, for Respondent/Cross-Appellant.

# OPINION

By the Court, SPRINGER, J.:

Donald Mosley, the father of four-year-old Michael Mosley, appeals the judgment of the trial court which terminated this father's joint legal and physical custody of his son, and vested "sole custody" in the child's mother, Terry Figliuzzi.

Shortly after Michael was born, the district court, in accordance with the wishes of the parents, decreed that the parents should have joint custody, with appropriate residential arrangements that would accommodate the child's age. Three out of the four times that the matter of custody came before the district court, the court concluded that joint custody was in the best interest of the child.

After the third joint custody decree was entered, the mother was successful in having the matter transferred to a new judge. She then applied for a hearing on her "Motion to Amend Court Order," a motion which she filed less than three weeks after the third joint custody decree. The stated purpose of her "Motion to Amend Court Order" was to correct claimed irregularities in the joint custody decree. The district court held hearings on the mother's motion to correct the third joint custody order, a motion which did not even suggest that custody be taken away from the father and given to the mother. For reasons that are not apparent from the record, the trial court, rather than either granting or denying the mother's Motion to Amend Court Order, decided to terminate the father's custodial rights and grant sole custody to the mother.

Apart from the readily apparent procedural defect inherent in the court's terminating the father's custody without having a change of custody motion before the court, the district court did not act in accordance with the state statutes relating to custody that were in effect at the time when it ordered the termination of joint custody. For these reasons the judgment of the trial court must be reversed.

## LITIGATION HISTORY

Michael Mosley was born on February 15, 1992. The first joint custody order was issued pursuant to a court master's recommendation. In June of 1993, the original joint custody decree was modified by a superseding "Stipulation and Order" under which the mother and father agreed that it was "the intention of the parties to reach, when the child is of an appropriate age, a true 50/50 time share."

In March of 1993, the mother sought to terminate the joint custody arrangement on the ground that she and the child's father were "unable to cooperate, communicate and support each other as parents" and that the child was in need of "the stability and structure inherent in a sole custody situation."[1] The mother's March 1993 motion to dissolve the joint custody arrangement was not heard until July of 1993. At this time the mother's counsel argued that "joint custody was not appropriate given the friction of the parties" and asked that the parents' joint custody be terminated and that the mother be awarded custody of the child "with a 50/50 time share if that can be worked out, so the child is spending good quality time with both parents." During the July 1993 hearing on the mother's motion for change of custody the district court asked the mother's counsel directly if, aside from the question of whether "joint" custody should continue, she had any "philosophical or practical objections to an equal division of time?" The mother answered the court's question by saying, "If Don [the father] is spending the time with Michael, I have never

---

[1] It is appropriate at this juncture to make note of a commonly raised objection to joint physical custody, an objection that eventually was raised by the mother in this case—that the child would be forced to go "back and forth" and that the child's life will be "disrupted" by being transported from one parent's home to the other's. This "disruption" is frequently used by psychologists and other "experts" to defeat the State's public policy in favor of "frequent associations and a continuing relationship with both parents." The debate between those who claim that shared custody creates an intolerable lack of stability and security in childrens' lives and those who claim that children are entitled, if it is at all possible, to the influence, love and companionship of both parents has been resolved by NRS 125.460. Still, there are lawyers and judges who continue to argue that although shared custody may be in the best interests of children, the confusion inherent in the "yo-yo" practice of moving the children about outweighs the advantage inherent in custody sharing. It appears now that the social sciences have resolved this debate, for the present, anyway. Although there are a number of studies relating to this question, the most extensive study to address the subject is that of Susan Steinman in "The Experience of Children in Joint Custody Arrangement: A Report and Study," 51 American Journal of Orthopsychiatry, 403-414 (1981). Dr. Steinman's study found that three out of four children she interviewed had no trouble moving back and forth between homes. ("Their clarity about their schedules and the location of their homes was impressive, particularly since some children switched as frequently as several times a week and had numerous places and people to go to (including school, day care, friends' homes, lessons).") Such studies are not offered as being conclusive on the question, but they do provide strong evidence that joint custody does not have the degree of adverse impact on children that is predicted by its critics. The impact of these studies is not that joint custody results in superior adjustment of children; they only stand for the propositions that courts can no longer safely cite "the best interests of the child" as reason for refusing to order joint custody and that joint physical custody, of itself, probably will not make life more difficult for most children than the traditional mother-custody/father-visitation arrangements of the past.

had an objection to that," adding that she did not "want to divide it up so Michael's life is so disrupted, and he's back and forth every night, and Don isn't with him."

After denying the mother's motion to dissolve the joint custody decree, the court in continuing the joint custody arrangement appropriately commended the parties for their willingness to share custody on an equal basis, stating that the mother and father were "both intelligent human beings, and each has quite a lot to offer both society and the child. *And I believe that the child's best interests are best served by having a father and a mother both involved in being responsible for him and sharing time equally with him.*" (Emphasis added.) As stated, the court denied the mother's application for sole custody[2] and ruled that "joint custody will continue as previously recommended and twice ordered by other courts with the division of time . . ., and now is the time to move to the equal division of time which the parties had stipulated to and was ordered by the previous court."

The court then explained that it understood the "disadvantage of moving the children" back and forth, but that, "[h]aving recognized that [disadvantage], . . . *the advantage of the child knowing each parent,* having a mother *and* a father, and having only one move per week outweighs the disadvantages." (Emphasis added.) Based on these considerations the court ordered joint physical custody, with the child's being with the father approximately half of the time, with only one transfer per week, the final order being issued on August 26, 1993. At the time of the entry of this August 26, 1993 decree, the district court adjudged that

---

[2]Although the district court appeared to have been completely justified by the facts in ordering the continuation of joint custody after this hearing because of the presumption and preference for joint custody discussed in the text and because a "50/50 time share" appears to have been the continued intention of this mother and father, another basis for denying the mother's attempt to gain sole custody of Michael is the mother's blatant and perjurious misrepresentations to the court. When the judge went out to what he thought was the mother's home to inspect the home surroundings of the child while the child was in the mother's custody, the judge discovered that the mother had lied about where she was living and had taken the judge to a place that was not in fact her residence. Upon being confronted with this fraud on the court, the mother readily admitted her lies in open court, thus: "I misrepresented to the Court that I had been living at that address and that in fact is not true." The trial judge would certainly have been justified in not accepting other testimony presented by the mother as a witness in the hearings on the motion.

The court properly admonished the mother in this way: "I think it's unfortunate any time a person comes in and lies to the Court. The first step in getting back on the right track is to tell the truth, begin from there. . . . You lied to us, took us out on a false goose chase, and we didn't get back until 10:00 o'clock last night."

"the child's best interests are best served by having a father and a mother involved in being responsible for him and sharing time equally with him," and by the child's "knowing each parent, [and] having a mother and a father."

Three joint child custody decrees have been entered in this case. The eventual termination of joint custody of this child was the outcome of the mother's filing a proper person "Motion to Amend Court Order," filed on September 13, 1993. The mother's motion was filed less than three weeks after entry of the third joint custody decree of August 26, 1993. The mother's motion for correction did not seek a termination of the long-standing joint custody decree or the vesting of sole custody in the mother; rather, the motion merely sought to "amend the Order [of August 26] to more accurately reflect the decisions rendered by the Court. A proposed Amended Order is attached." The attached "Amended Order" proposed by the mother suggested changes in residential arrangements but fully accepted the court's August 26 findings and conclusions that "joint custody is in the best interest of the minor child," that the parties had stipulated to joint custody, that the "child needs both parents" and that after a prescribed " 'time out' between them . . . good sense and fair play will take over in order that the parties will be able to raise a healthy, happy child." The "Amended Order," proposed by the mother and attached to her motion also recognized the above-quoted provision that "custody shall be divided 50/50, equally, between the parties as was the intention set forth by the Arbitrator previously and in the Stipulation and Order executed by the parties previously." The gist of the mother's motion to amend the August 26 decree was to correct claimed discrepancies between the order and the transcript and to "request[] that such discrepancies be amended to reflect the true decision handed down by the court." The motion contained no request for a change of custody.

The mother's Motion to Amend Court Order, filed for the stated purpose of correcting supposed discrepancies between the transcript and the court's order, lay dormant from its filing in September of 1993 and was not brought to a hearing until June 3, 1994. By the time of the June 3 hearing, the judge who had been hearing the case disqualified himself, filing a document on March 15, 1994, in which he stated that he had "come into information concerning the respondent, Terry Marie Figliuzzi" and that the information was "so prejudicial against her" (such as her "attempting to manipulate the judicial process without consideration for the best interests of the minor child") that he did not believe that he could continue to judge the case in an impartial and unbiased manner.

On June 3, 1994, a newly-assigned judge, Judge Steven

Kosach, held a hearing on the mother's motion to correct supposed discrepancies in the joint custody decree. No custody decision came out of the June 3 hearing, but the court did enter an order appointing one Linda Peterson, Ph.D "for the purpose of a home evaluation and evaluation of both parties and their child"; and hearing on the Motion to Amend Court Order was deferred until September 9, 1994, presumably for the purpose of informing the court on matters relating to residential arrangements under the August 26, 1993, joint custody decree. On the day before the September 9 hearing on the Motion to Amend Court Order, the mother presented to the court *for the first time* the suggestion that she wanted a radical change in child custody. In a supporting document entitled "Summary of Relief Requested by Respondent Terry Marie Figliuzzi," filed the day before the court hearing, the mother notified the court and the father for the first time that she thought "the previous custody order" (of August 26, 1993) "should be changed," and urged that she be granted "primary physical custody of Michael" and that the father's "visitation with his son be limited and supervised."

On the day before hearing, the mother announced her intention to change her approach from that of "modifying" and correcting "discrepancies" (per the mother's September 1993 Motion to Amend Court Order) to seeking a radical change of custody whereby the father's custody would be terminated. A reading of this record gives reason to believe that the mother's change of position from that of correcting discrepancies by way of her "Motion to Amend Court Order" to that of trying to deprive the father of custody of Michael was brought about by forum shopping and was prompted by the mother's being able to remove the judge who, based on essentially the same set of facts that we now have before us, ordered that the joint custody of Michael should continue. The procedural aspects of this case are deserving of some scrutiny.

### IMPROPRIETY OF THE TRIAL COURT'S TERMINATING JOINT CUSTODY BASED ON A PROCEDURAL "MOTION TO AMEND COURT ORDER"

The district court did not have before it a motion to terminate the father's custody nor a motion to award sole custody to the mother. The mother filed her Motion to Amend Court Order only a few weeks after the final August 26, 1993 decree which continued in effect the previous joint custody decree. The mother did not and could not, of course, seek a change in custody so soon after all matters relating to child custody had been decided upon by the court.

Two areas of concern are raised by the foregoing. The first is the lack of notice to the father that the mother was seeking to terminate his custody of his child. In Dagher v. Dagher, 103 Nev. 26, 731 P. 2d 1329 (1987), we ruled that the trial court erred in changing custody without prior, specific notice of the requested change. Although a memorandum filed by the mother on the day before the hearing does mention her desire to terminate the father's child custody rights, as stated, there certainly was not on file a proper motion seeking to terminate the joint custody.

There being no proper motion for change of custody on file, naturally there was nothing before the court to indicate any change of circumstances that had occurred *after* the entry of the joint custody decree. It is difficult to think of any change of circumstances in this case—the parents could not get along in the beginning, and they cannot get along in the end. This quarreling does not mean that one or the other of the parents should be given sole custody.

We said in Truax v. Truax, 110 Nev. 437, 438, 874 P.2d 10, 11 (1994), that *"if it is shown that the best interest of the child requires the modification or termination"* of a joint custody, "[a]ny order for joint custody may be modified or terminated by the court upon the petition of one or both parents or on the court's own motion." This did not mean that we abandoned the doctrine of *res adjudicata* in child custody matters and that persons dissatisfied with custody decrees can file immediate, repetitive, serial motions until the right circumstances or the right judge allows them to achieve a different result, based on essentially the same facts. " 'The moving party in a custody proceeding must show that circumstances . . . have substantially changed *since* the most recent custodial order. . . . Events that took place before the proceeding [are] inadmissible to establish a change of circumstances.' " McMonigle v. McMonigle, 110 Nev. 1407, 1408, 887 P.2d 742, 743 (1994) (quoting Stevens v. Stevens, 810 P.2d 1334, 1336 (Or. Ct. App. 1991)). It is rather obvious that when a judge makes a decision on child custody, such a decision should not be subject to modification if substantially the same set of circumstances that were present at the time the decision was made remains in effect. What we said in *Truax* was that the best interest of the child was paramount and that we would not allow reliance on a technical failure to allege a change of circumstances to interfere with this paramount consideration. We certainly did not say or intimate that litigants were to try the same issues over and

over again, before different judges, based on the same predicate facts.[3]

The dissent remarks that "it is clear from the pleadings and the history of the proceedings that both parties wanted to litigate the custody issue." This is not true. It certainly cannot be said that this father wanted to litigate the custody issue all over again when

---

[3]We note that at the hearing on the Motion to Amend Court Order the mother did try to embellish her case by showing some circumstances that were not related to her principal ground for seeking sole custody, which was the parents' inability to get along with each other. Two "new" items that came up in the last hearing are the father's calling the child by a nickname, "Skeeziks" (Skeezix, of cartoon fame) and the father's creating a danger to the child by supposedly leaving loaded weapons around the house. Neither of these matters have any substance.

The nickname contention is almost laughable. The father has gotten into the habit of calling his son "Skeeziks." Using this nickname, says the mother's child psychology expert, Dr. Marks, creates a danger of having a "profound and adverse effect on the development of the minor child." The contention that the father should be deprived of his fatherhood because he calls Michael "Skeeziks" must be rejected on the ground of inherent absurdity.

The "loaded gun" argument is also rather obviously a shallow attempt to show some ground for terminating joint custody other than that of the parties' continuing conflict. Dr. Linda Peterson relied in her report to the court on the father's keeping a "loaded gun" under his pillow. On cross-examination, Dr. Peterson admitted that her home visit did not reveal this condition in the father's home, but, rather, her investigation revealed a gun in a cabinet, and she did not know whether the gun was loaded or not. We do not find in this record a case for the proposition that the father, Judge Mosley, is so careless about leaving loaded weapons at the disposal of his son that he is not entitled to custody.

There is one other possible factor that might have been considered that was not before the court at the August 26, 1993 hearing. As mentioned, the court appointed Linda Peterson, Ph.D., to make an evaluation and recommendation in this case. She expressed the opinion that Michael's best interests would be served by depriving him of his father. Dr. Peterson's opinion was based on the mutual conflict of the parties and on another interesting factor, the father's being a judge. Speaking of the father's profession, Dr. Peterson had this to say:

Where people are very preoccupied with other issues in their lives—and I would characterize Don [Judge Mosley] in that fashion in the report—where they have to consider the needs of many. And have a very demanding job, that is a factor that I have to factor in on the case.

That the father should be denied custody because he is a judge is somewhat more sensible than Dr. Mark's opinion that calling Michael by a nickname may have a "profound and adverse effect on the development of the minor child"; but we trust, if this matter comes before the court again, that not much weight will be given to the father's occupation in the making of a determination of how much residential responsibility should be given to him when this allocation is made in accordance with the directions given in this opinion.

it had just been decided—for the third time. There is no reason to believe that he was anxious to put his custody rights unnecessarily in jeopardy. The Motion to Amend Court Order sought only minor amendments relating to residential arrangements *only.* There was no reason for the father to believe that the court's wanting a home evaluation had anything to do with other than the "fine-tuning" of residential responsibilities and periodic allocations of time with each of the parents. The father was of course bound by the court's *sua sponte* directions in this regard; but this does not give notice to the father that the mother had intentions of depriving him of his son altogether. As stated above, the father did not know that this was the mother's intention until the day before the hearing. This can hardly be considered as proper notice for a hearing that would result in the father's losing his child. *See Dagher,* above. It is not reasonable, under these circumstances, for the dissent to suggest that the father consented in any way to re-litigate the issue of custody as distinguished from merely settling issues relating to residential arrangements, a subject that had been the matter of periodic dispute between the parties.

### "PRESUMPTION," "PREFERENCE" AND COOPERATIVENESS IN JOINT CUSTODY CASES

NRS 125.490 provides that when parents "have agreed to an award of joint custody" (as was the case here), there is a "presumption, affecting the burden of proof, that the joint custody would be in the best interest of the minor child" and a statutory "order of preference" which states as a first preference an award to both parents jointly unless the court is willing to "state in its decision the reasons" for the denial of joint custody. It does not appear from our reading of the record that in terminating joint custody the court gave effect to the stated "presumption" or "preference" or that it stated in its decision any reason for denying joint custody.

NRS 125.460 dictates the public policy of this state in child custody matters. The policy is that the best interests of children are served by "frequent associations and a continuing relationship with both parents" and by a sharing of parental "rights and responsibilities of child rearing." It is clear from the testimony on this Motion to Amend Court Order and from the statements and rulings of the court that the decision to deprive the father of custody was brought about almost entirely by the fact that these two parents could not get along together and were having great difficulties in being cooperative in matters relating to their joint

custody. If the bickering and chronic disagreement was so severe as to affect the welfare and upbringing of Michael, then (after considering which parent was the more cooperative) this might have been a ground for altering the joint custody decree, *if* there had been a proper motion with reasonable notice and *if* reasons had been stated in the decree. If the trial court had had a proper motion before it and had decided to terminate the preferential joint custody, the court was bound under NRS 125.490 to state the reasons for its denial of joint custody and to state why the difficulties that the parents were having justified removing the child's father from his life. None of these requirements has been fulfilled in this case.

Cooperativeness of the parents in child custody matters is another factor that must be considered in cases like this one. NRS 125.480(3)(a) provides that when "awarding custody to either parent, the court *shall* consider, among other factors, which parent is more likely to allow the child to have frequent associations and a continuing relationship with the noncustodial parent."[4] (Emphasis added.) This prudent legislative directive rewards cooperativeness and punishes obstinacy. If the court had had a proper motion before it and had properly considered the mentioned statutory presumption and preference for joint custody, it was still obligatory for the court to consider, among other factors, which parent was more likely to allow a continuing relationship with the other parent. There is nothing in this record

---

[4]We make note that the policy statement adopted by the Nevada Legislature favoring frequent associations and a continuing relationship with *both* parents and which encourages parents to share equally parental responsibilities after separation represents a substantial departure from the cultural assumptions which have been accepted in child custody decisions for many years. Prior to the enactment of the present statute, except in cases of obvious unfitness of the mother, children were almost always "awarded" to the mother after separation or divorce. This arrangement was based on the generalization that mothers are usually better parents than fathers. This assumption was expressly done away with by our legislature when it declared that no preference in custody matters should be given for the sole reason that the parent is the mother or the father. NRS 125.480(2). Nevada has recognized that raising children is not the exclusive province of women any more than work outside the home is the exclusive province of men. Unfortunately, such legislative declarations are slow to be accepted, and very often, the "best interests of the child" is viewed by parents and family court judges to mean, still, custody with a "primary custodian," almost always the mother, with intermittent "visitation" privileges being granted to the father. It is, then, commendable that in this case both the parents and the court sought and provided for an arrangement in which Nevada's public policy favoring shared parenting after separation would be carried out. It is indeed unfortunate and clearly contrary to the best interest of their child that these parents were unable to persevere in their original parenting plan and that the mother felt compelled to try to deprive the father of his custodial rights.

to indicate that the court abided by the statutory requirement that it ''shall consider'' this cooperation factor before it awarded sole custody to the mother. If the mother decides to file a proper motion to change custody, a ruling must be made on this issue if the court is going to rescind the joint custody decree.

Because there was no motion, timely or otherwise, to change custody before the court, because no due consideration was given to the presumption and preference for joint custody, because no consideration was given by the trial court to the question of which parent is more likely to allow Michael to have frequent associations and a continuing relationship with the other parent, and because it does not appear from this record that the best interest of Michael will be served by removing his father from his life, the judgment of the trial court must be reversed.

## SOME OBSERVATIONS ON SHARED CUSTODY AND THE "BEST INTEREST OF THE CHILD"

Because the mother may in the future seek, by proper means, to attack the joint custody decree of August 26, 1993, and because it is rather apparent that the trial court, in ruling on the mother's Motion to Amend Court Order, did not, in ordering the subject termination of joint custody, consider all of the statutory requisites relating to ''best interest of the child,'' we deem it appropriate to comment on this vital aspect of child custody adjudication.

The enactment of NRS 125.460,[5] in 1981, was a remarkable historical event. Throughout most history legislatures and courts have been blind to the reality that most children are in most cases much better off, after their parents separate, if they can continue to have two parents rather than only one.[6]

The realization that children are better off with both parents has been a long time in coming. Throughout most child-custody

---

[5]NRS 125.460 provides:

> **125.460. State policy.** The legislature declares that it is the policy of this state:
>
> 1. To ensure that minor children have frequent associations and a continuing relationship with both parents after the parents have become separated or have dissolved their marriage; and
>
> 2. To encourage such parents to share the rights and responsibilities of child rearing.

[6]We must face the reality that when the court deprived Michael of his father, it was placing the child at great risk. As put recently by Wade F. Horn, Ph.D., former United States Commissioner for Children, ''If you look at any measure of child well-being you see that kids are placed at great risk when they grow up absent their fathers. They are more likely to have psychological problems, abuse drugs and alcohol, live in poverty and fail in school. Seventy percent of kids in state reform institutions grew up without fathers.''

litigation in the past, the child was "awarded" to one parent or the other; one parent "won" custody, and the other "lost." In either case, the child lost because the child was in many cases unnecessarily deprived of one parent. Courts, until recently, seem to have been unable to grasp the rather simple fact that most children have two loving parents and are entitled to the love of both—to the greatest extent possible—in the event that the two parents decide not to live together in one household.

Throughout most history, and in much of the world today, the law has contained a strong or conclusive presumption that sole custody should be awarded to the father in all cases of family dissolution. In this country, the paternal preference started changing as the industrial revolution accelerated through the 19th century when fathers were being pushed out of family farms and other family enterprises into the factories. This started the trend toward maternal preference that became almost as absolute as the paternal preference had been before.

As the trend toward maternal preference developed, social theorists began to define rather rigid sex role separations with the father being seen as the external wage earner and the mother as a home-bound nurturer. Eventually the trend developed to the point where there was an almost complete swing of the pendulum, resulting in what came to be known as the "tender years doctrine," under which exclusive custody was awarded almost automatically to the mother, with the same rigidity as the earlier awards of automatic custody to the father.

As of late, the tender years doctrine has gone out of vogue, and the law has been advancing, both legislatively and judicially to the point of recognizing that either father or mother could be safely adjudged to be the better parent.[7] After this recognition, the next step was the recognition that *the best parent is both parents*.

There is presently a broad political and scientific consensus that children do better when they have two actively involved parents.[8] By encouraging "frequent associations and a continuing

---

[7]For approximately ten years the pendulum has been swinging to a more centered position. Most states have abrogated the tender years doctrine as a violation of equal protection, and virtually all states base custody decisions on "best interests" rather than by reference to the parents' gender. In 1991, Nevada expressly recognized that "[n]o preference may be given to either parent for the sole reason that the parent is the mother or the father of the child." NRS 125.480(2).

[8]For example:

> With unanimity of view that is virtually unparalleled, social science researchers have documented the fact that children of divorce or unwed birth fair poorly in comparison to children from intact families. Regardless of the social problem which is under consideration, whether

relationship with both parents" and by enacting the joint custody preference statute our legislature was recognizing the importance of encouraging family preservation after separation and divorce and the vital necessity for maintaining both paternal and maternal influences on children to the greatest extent possible. The legislature has recognized that the key to preserving the "best interests" of the child lies in accepting the principle that it is not necessary for the courts, in child custody decrees, to perform a "parentectomy."[9]

The record in this case discloses that both parents are good parents and genuinely love Michael and that both parents want to function as parents and not as occasional visitors. The courts should continue to seek to preserve for Michael, and for other children, as much as possible of the benefits that we know to flow from full, active, emotional and physical relationships between children and both of their parents. Thus, the courts should be striving to impose as little change from the intact two-parent family as possible after the parents separate. This is exactly what the court did for most of Michael's life and until the order entered in this case, when the parentectomy was performed, excising Michael's father from Michael's life.

The termination of this father's custody could very easily be perceived as being an unnecessary "parentectomy" and in a certain sense, a parricide. The question that must be addressed by the trial court now is whether, after the parties agreed to joint custody and after three judges awarded joint custody to the mother and father, it is necessary and in the best interests of Michael to sever the joint custody and to alter the agreed-upon 50/50 custody arrangement. Is it necessary and in the best interest of Michael that this father, who so wants to be actively engaged in the upbringing of his son, must become a stranger to his son and another every-other-week-end father?

We stress the risks that are involved in terminating the joint custody in this case and in changing father-custody to father-visitation. As we point out throughout this opinion, significant

---

it be drug abuse, juvenile delinquency, teenage pregnancy, low self-esteem, poor academic achievement, or even suicide, research points to family breakdown as a primary cause.

*Children, Family, Neighborhood, Community: An Empowerment Agenda,* American Legislative Exchange Council (1991).

[9]"Preventing Parentectomy After Divorce," Frank S. Williams, M.D., Director of Family and Child Psychology, Director or Programs for Children and Families in Divorce, Cedars-Sinai Medical Center of Los Angeles, California (1990).

differences do emerge in social science studies between one-parent and two-parent families, differences that will most likely affect the future life of Michael.[10]

## SOME OBSERVATIONS ON DEPRIVING A CHILD OF ONE OF ITS PARENTS ON THE GROUND THAT THE PARENTS CANNOT GET ALONG TOGETHER

With respect to the parties' continued bickering and inability to get along with each other, we note that the basic thrust of the mother's present position is that the father's custody must be ended because the father *and* she could not get along with each other. She takes this position even though she had formally stipulated with the child's father to the entry of a joint custody decree and even though on three different occasions judges have decreed that the best interest of the child dictate joint custody with equal physical custody being enjoyed by both parents. She takes this position even though she declines to lay the blame for this unhappy condition on either her husband or her. It would appear that the father is being made to suffer all of the adverse consequences relating to this condition, irrespective of which party brought it about.

Although other reasons have been suggested by the mother in her efforts to "win" custody in this case, it is quite clear that all of her claims get down to the simple assertion that Michael's parents are at such odds with each other that the father must be cut out of the child's life. A basic question that must be answered in this case is, then, whether Michael should be denied the custodial care of one of his parents because of the parents' mutual fault in being unable to make suitable arrangements for joint physical custody.

The district court had already recognized and dealt with the disagreeable parents problem in its August 28, 1993 decree. The court discussed "the dispute that exists between the parties" but concluded that with a "time out, with only one transfer per week and with some third party mediation, a substantially equal sharing of custody was feasible and in the best interest of the child." The decree which we now have under review, the September 30,

---

[10]In 1965, Patrick Moynihan was criticized for making the following observation on the consequences of family breakdown; Moynihan's heresy in 1965 probably reflects the consensus today:

> From the wild Irish slums of the 19th century eastern seaboard, to the riot torn suburbs of Los Angeles, there is one unmistakable lesson on American history: A community that allows a large number of men to grow up in broken families, dominated by women, never acquiring any stable relationship to male authority, never acquiring any rational expectations about the future—that community asks for and gets chaos.

1994 decree, comes to the opposite conclusion on virtually the same facts (with the exception of Dr. Peterson's testimony,[11] the "Skeeziks" testimony and the loaded-gun-under-the-pillow testimony). The questionable assumption behind the September 30, 1994 decree, now under review, is that the parties do not get along, that they are never going to be able to get along, and that, therefore, one or the other of the parties must be denied custody of Michael. It is this assumption (the assumption that in cases involving parents who cannot agree on the times and manner of distributing joint residential responsibilities, one or the other of the parents must lose custody and meaningful, healthy contact with the child) and the accompanying reality that Michael is now being deprived of his father that we now address in this opinion.

The danger that arises in situations involving two, equally-competent but chronically conflicting parents is seen in cases in which a father might come in and say, in effect, "I cannot get along with the mother of my child; therefore, the court must award sole custody to me, the father." The court's accepting this kind of argument has the effect of permitting one uncooperative parent to deprive a child of either his mother or his father, merely by establishing that the parents are in conflict. Proving the existence of a conflict between parents could, thus, allow the complaining party to "win"[12] a custody "battle." The prize should not automatically go to the parent who comes before the court and tells the court, as did the mother in this case, something to this effect: "I told the court before; we cannot get along and are not going to get along in the future—therefore, the best interests of the child requires that you give *me* the sole custody." Parental conflict almost always involves some fault on the part of each parent. To permit one non-cooperative parent to come in and get sole custody just because of a mutual conflict not only rewards uncooperative conduct but also, as said before, unnecessarily

---

[11]We note that Dr. Peterson's report and recommendation was, for some reason, timely delivered to the mother but was not given to the father until the day before the hearing.

[12]Courts are accustomed to adversarial presentations that are resolved by the selection of a winner and a loser. The system works well in commercial disputes. The court picks a winner and a loser; the loser is ordered to pay the winner, then we move on to the next case. The difference in domestic relations cases is that it is immoral and destructive to treat children as prizes to be awarded to a winner and denied to a loser.

The mother "won" this case, but by removing the child's father from his life, she really loses, as, certainly, does the child. Every-other-week-end "visitation" effectively takes Michael's father away. This is not the kind of "victory" that we want to see in our family courts.

deprives the child of the company of one or the other of his or her parents.

If the decree terminating joint custody were allowed to stand, the mother would have "won" the case, having been rewarded with an "award" of full custody. The father would have "lost" and would have been punished by being deprived of the equal custody that he formerly had—all because (as put by the trial judge in the decision that is now under review) "*two* people . . . are extremely hostile and distrustful towards one another." (Emphasis added.) In the case now before us the court found that there "is no chance that the *parties* [*both* of them] can agree on anything having to do with their child, let alone attempt to resolve their differences themselves, even with professional help." It is notable that the trial judge did not assign a majority of the fault to one party or the other and that, throughout, the assumption is that both parties are relatively equally at fault in their failure to put their son's welfare above their own personal bickering. What should the court do, then, when two parents want to have equal custody of their child but are unable to agree about what to do with respect to making arrangements for the equal sharing of custody? Quite obviously the courts should not grant custody to the first parent who comes in and claims that the child should be awarded to the complaining party because he or she cannot get along with the other parent. To permit this to happen would permit one parent to sabotage a joint custody merely by convincing the court that his or her bickering with the other parent has created a situation in which the "best interest of the child" requires that the child be "awarded" to the complaining party. In this kind of scenario the more aggressive and hostile parent is more likely to "win" and thus become the sole custodian of the child, while the more cooperative parent who did not have the presence of mind to seek sole custody on the ground that the parents were warring, becomes a marginal, no-real-contact parent. Fortunately, NRS 125.480(3)(a) is designed to keep this from happening and favors the parent who is "more likely to allow the child to have frequent associations and a continuing relationship" with the other parent.

We look to the District of Columbia for an insightful discussion of the importance of favoring the cooperative parent in making residential allocation in cases where joint custody is adjudged not to be in the best interests of the child. In Prost v. Greene, 652 A.2d 621 (D.C. Cir. 1995), the District of Columbia Court of Appeals recognized and approved the propriety of considering the relative cooperativeness of the two parents in allocating residential responsibility. The court validated the trial court's finding that it is "overwhelmingly in the childrens' best

interests that they spend substantial time with both their parents'' and recognized that ''determining that the best interest of the child requires developing the best possible relationship with both parents.'' *Id.* at 628. The court expressed its approval of the idea that conduct by one parent ''which interferes with the fulfillment of children's need for the guidance and love of [the other parent] may have a serious effect on the welfare of children,'' (*Id.* at 628 (citing Kahn v. Kahn, 252 A.2d 901 (D. C. 1969)) and noted that, ''[i]ndeed, some jurisdictions [like Nevada] by statute require a court, in determining custody, to consider a parent's willingness and ability to promote a positive relationship between children and the other parent.'' (Citing Katherine Kataz, *Custody Disputes Between Parents,* in 2 Child Custody and Visitation Law and Practice, at 10-115 and note 44, *q. v.*)

In the *Prost* case, Judge Harriet Taylor of the Superior Court of the District of Columbia granted custody to the father (Greene) of the two minor children of the parties and granted ''visitation rights'' to the mother.[13] It does not appear in the *Prost* case how extensive the visitation rights were, but the court's language would indicate that it extended well beyond partial visitation on every other week-end. This is evidenced by a number of the *Prost* trial judge's statements in her memorandum opinion; for example: ''It is important that the children maintain substantial and regular contact with both parents so that they can realize and reap the benefits of the love, the support and the individual personalities of both their mother and their father . . . .'' *Prost,* 652 A.2d at 625 n.5.

The *Prost* trial judge's decision to make the father the majority custodian appears to have been based principally on her observations of the uncooperative nature of the mother and of ''repeated instances of '[in]flexib[ility]' by [the mother] which 'bode[] ill for both the atmosphere and the extent of the time that she would permit the children to spend with their father (regardless of any court order) . . . .' '' *Id.* at 625.

On appeal, the mother attacked the trial court's ''improper focus on Prost's interaction with Greene,'' claiming that the court

---

[13]Apropos to the case now before us, Judge Taylor cautioned the mother and father in *Prost,* in her memorandum opinion, as follows:

The parties should be ashamed of themselves, but it does not appear that they are. These two highly-educated, talented and politically astute adults, with responsible positions that affect thousands of lives, have not found it within themselves to put aside their differences, to call a halt to the hostilities, for the sake of the children they profess to love and, the Court believes, truly do love.

The parties must turn that picture around. They must remember and convey that *both* parents are important to their children's development into independent, well-rounded, confident adults.

gave too much attention to the "negative aspects of Prost's relationship with Greene." The Court of Appeals rejected this argument and approved of the trial court's recognition of the importance of the relationship between the mother and father, "especially as concerns a factor that was paramount for the judge: which parent would predictably cooperate most in according the *other* a regular and substantial role in the children's lives." *Id.* at 627.

In the proceedings which terminated the joint custody in this case and which allocated custody in a manner that virtually shuts the father out from his son's life, no consideration was given by the court to the vital factor, "which parent is more likely to allow the child to have frequent associations and a continuing relationship with the noncustodial parent" (NRS 125.480(3)) or, as put in *Prost,* "which parent would predictably cooperate most in according the *other* a regular and substantial role in the children's lives."

Should the mother file a proper motion for the change of child custody in the district court, the court should pay heed in a case of this nature to the cooperation factor discussed above.

The judgment of the trial court is reversed, and the August 26, 1993, joint custody decree shall remain in force and effect until such time, if any, as the decree is modified by the district court in a manner that is in accordance with this opinion.

STEFFEN, C. J., and Wagner, D. J., concur.[14]

SHEARING, J., dissenting, with whom ROSE, J., concurs:

I would affirm the judgment of the district court.

In March 1993, the mother filed a motion for modification of joint custody. The motion requested, *inter alia,* that the mother "be awarded sole legal and physical custody of the minor child." After a hearing on the matter, the district judge ordered that joint legal custody continue with virtually equal physical custody. On September 13, 1993, the mother filed a motion to amend the court order.

A period of acrimonious court proceedings involving visitation and other issues followed. On May 31, 1994, the father filed an opposition to the mother's motions for relief and in his prayer for relief requested "[t]hat both Respondent and Petitioner be Ordered to have psychiatric evaluations by the same psychiatrist selected by this court." Both parties had previously agreed to be subjected to home studies and psychological evaluations, but

---

[14]The Honorable Richard Wagner, Judge of the Sixth Judicial District Court, was designated by the Governor to sit in place of THE HONORABLE CLIFF YOUNG, Justice. Nev. Const. art. 6, § 4.

apparently no such studies or evaluations had been made. A hearing was held on June 3, 1994, at which numerous witnesses testified. After the hearing, the district judge ordered that Dr. Linda W. Peterson, a psychologist, conduct an evaluation of the home environment, the parties and the child. The district judge ordered that Dr. Peterson report to the court with her findings and recommendations, after which another hearing would be held. The district court also ordered that "[f]ollowing the conclusion of the hearing and a report to the Court from Dr. Peterson, this Court will make a determination as to custody." A further hearing with additional testimony was conducted on September 9, 1994. Both mother and father participated fully in all the proceedings with no objection.

Neither party on appeal has raised the issue of whether child custody was properly at issue before the district court and it is clear from the pleadings and the history of the proceedings that both parties wanted to litigate the custody issue. Yet the majority would hold that a procedural defect is fatal. NRCP 15(b) provides:

> When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues.

The custody of Michael was appropriately tried by the district court with the parties' consent.

After the hearings, the district court made extensive findings of fact and concluded that Michael's best interests would be served by vesting sole legal custody in the mother. The court found the following:

> Testimony given to this Court presents two people who are extremely hostile and distrustful towards one another. . . . The parents focus this venom towards one another, under no uncertain terms, and in virtually every place the two meet. They cannot affect even a custodial exchange of the child, Michael, without major disputes, even though both profess to love him. . . .
>
> There is no chance, based on the evidence produced in both days of testimony, that the parties can agree on anything to do with their child, let alone attempt to resolve their differences themselves, even with professional help.

The Court went on to make detailed findings regarding the parties and their interaction with Michael which justify overcoming the presumption in favor of joint custody. Based on these findings, the court concluded "that Michael would be safer, more warmly loved and more daily nurtured with the mother, in the mother's home." The court specified visitation and child support, which neither party appealed. The court also denied attorney fees to both parties, which the parties did appeal.

In a child custody case, the district court's foremost concern is the welfare of the child. Culbertson v. Culbertson, 91 Nev. 230, 233, 533 P.2d 768, 770 (1975). It is presumed that the district court properly exercised its judicial discretion in determining the best interests of the child. *Id.* The determination will not be overturned absent a clear abuse of discretion. *Id.* There is absolutely no indication that the court abused its discretion. On the contrary, the court made extensive findings which fully justify its conclusion and order, both as to child custody and attorney fees. Therefore, I would affirm the order of the district court.