129 Nev., Advance Opinion 68

# IN THE SUPREME COURT OF THE STATE OF NEVADA

SHA'KAYLA ST. MARY,
Appellant,
vs.
VERONICA LYNN DAMON,
Respondent.

No. 58315

**FILED**

OCT 03 2013



Appeal from a district court order determining custody of a minor child. Eighth Judicial District Court, Clark County; Kenneth E. Pollock, Judge.

*Reversed and remanded with instructions.*

Accelerated Law Group and Joseph Timothy Nold, Las Vegas,
for Appellant.

Wolf, Rifkin, Shapiro, Schulman & Rabkin, LLP, and Bradley S. Schrager, Las Vegas,
for Respondent.

---

BEFORE THE COURT EN BANC.

## OPINION

By the Court, SAITTA, J.:

This appeal concerns the establishment of custodial rights over a minor child born to former female partners, appellant Sha'Kayla St. Mary and respondent Veronica Lynn Damon. The couple became romantically involved and decided to have a child. They drafted a co-parenting agreement, and eventually, St. Mary gave birth to a child through in vitro fertilization, using Damon's egg and an anonymous

13-29455

donor's sperm. Thereafter, their relationship ended, leading to the underlying dispute concerning the parties' custodial rights over the child.

The district court, apparently relying on a previous order that recognized Damon as the child's legal mother and granted her the right to be added as a mother to the child's birth certificate, concluded that St. Mary was a mere surrogate. The district court refused to uphold the parties' co-parenting agreement or consider whether St. Mary was a parent entitled to any custodial rights. St. Mary appealed, challenging the district court's conclusion that she was a surrogate and its refusal to uphold the co-parenting agreement.

We first conclude that the district court erred in determining, without holding an evidentiary hearing on the issue, that St. Mary was a surrogate lacking any legal rights to parent the child. The version of NRS 126.041(1) that existed at the time of the district court's determinations, as well as the version that exists now, provides that a mother-child relationship may be established by "proof of [the mother] having given birth."[1] See NRS 126.041(1) (2009); 2013 Nev. Stat., ch. 213, § 34, at 812. Here, the parties agree that St. Mary gave birth to the child but disagree

---

[1]Our opinion implicates NRS Chapter 126, which the Legislature revised in 2013 after the district court made its determinations. See 2013 Nev. Stat., ch. 213, §§ 1-36, at 805-13. These amendments do not change our conclusions about the issues on appeal. However, we review the district court's determinations under the law that was in effect at the time of its determinations. When citing to a statute that was amended after the district court's determinations, we identify the amendments and the version of the statute that was in effect at the time of the proceedings below.

about whether they intended for St. Mary to be a mother to the child or a mere surrogate. Nothing in either Nevada law or in this case's record, including the birth certificate order, conclusively demonstrates that NRS 126.041(1) does not apply to St. Mary's relationship with the child. Accordingly, a factual issue exists regarding whether St. Mary was a legal mother to the child or was a surrogate or gestational carrier without legal rights to the child, and we remand this matter for an evidentiary hearing on that issue.

Second, we conclude that St. Mary and Damon's co-parenting agreement is not void as unlawful or against public policy. When two parents, presumptively acting in the child's best interest, reach an agreement concerning post-separation custody, that agreement must not be deemed unenforceable on the basis of the parents being of the same sex. In this matter, the parties' co-parenting agreement stated that if their relationship ended, they would continue to share in the responsibilities and privileges of being the child's parent. Thus, if the district court determines on remand that both St. Mary and Damon are the child's legal parents, the district court should consider the co-parenting agreement and its enforceability in determining custody.

## FACTS AND PROCEDURAL HISTORY

Approximately one year after entering into a romantic relationship with each other, St. Mary and Damon moved in together. They planned to have a child, deciding that Damon would have her egg fertilized by a sperm donor, and St. Mary would carry the fertilized egg and give birth to the child. In October 2007, Damon's eggs were implanted into St. Mary. Around the same time, Damon drafted a co-parenting agreement, which she and St. Mary signed. The agreement indicated that

Damon and St. Mary sought to "jointly and equally share parental responsibility, with both of [them] providing support and guidance." In it, they stated that they would "make every effort to jointly share the responsibilities of raising [their] child," including paying for expenses and making major child-related decisions. The agreement provided that if their relationship ended, they would each work to ensure that the other maintained a close relationship with the child, share the duties of raising the child, and make a "good-faith effort to jointly make all major decisions affecting" the child.

St. Mary gave birth to a child in June 2008. The hospital birth confirmation report and certificate of live birth listed only St. Mary as the child's mother. The child was given both parties' last names, however, in the hyphenated form of St. Mary-Damon.

For several months, St. Mary primarily stayed home caring for the child during the day while Damon worked. But, nearly one year after the child's birth, their romantic relationship ended, St. Mary moved out of the home, and St. Mary and Damon disagreed about how to share their time with the child. St. Mary signed an affidavit declaring that Damon was the biological mother of the child, and in 2009, Damon filed an ex parte petition with the district court to establish maternity, seeking to have the child's birth certificate amended to add Damon as a mother. The district court issued an order stating that St. Mary gave birth to the child and that Damon "is the biological and legal mother of said child." The 2009 order also directed that the birth certificate be amended to add Damon's name as a mother.

Thereafter, St. Mary instituted the underlying case by filing a complaint and motion, in a separate district court case, to establish

custody, visitation, and child support. In response, Damon contended that, due to her biological connection, she was entitled to sole custody of the child. Damon attached the 2009 order to her opposition.

During a hearing on St. Mary's complaint, the district court orally advised St. Mary that she had the burden of establishing her visitation rights as a surrogate, and the court scheduled an evidentiary hearing regarding her visitation. In a subsequent hearing, the district court ruled that the issues surrounding the parties' co-parenting agreement would be addressed at the evidentiary hearing.

Damon filed a motion to limit the scope of the evidentiary hearing to the issue of third-party visitation, excluding any parentage and custody issues. She asserted that the district court had already determined that St. Mary must establish her visitation rights as a surrogate and, as a result, there was no need to provide evidence to determine parentage. St. Mary opposed the motion, arguing that she was entitled to a full evidentiary hearing because limiting the hearing's scope to third-party visitation would, in effect, deny her parental rights without any opportunity to be heard on the matter.

The district court held the evidentiary hearing. Before taking evidence, the district court considered Damon's motion to limit the hearing's scope. Apparently looking to the 2009 birth certificate order and believing that Damon's status as the sole legal and biological mother had already been determined, the court decided that it would only consider the issue of third-party visitation. The limitation of the hearing's scope was significant. The district court barred consideration of St. Mary's assertion of custody rights, which concern a parent's legal basis to direct the upbringing of his or her child, *Rivero v. Rivero*, 125 Nev. 410, 420, 216

P.3d 213, 221 (2009), and limited the hearing to a lesser right of third-party visitation. *See* NRS 125C.050.

The hearing moved forward with the parties focusing on the visitation issue. St. Mary and Damon gave conflicting testimonies regarding their relationship, the co-parenting agreement's purpose, and their intentions in using in vitro fertilization to produce the child. St. Mary testified that she and Damon intended to create the child together, wanted the child to be their child, and fertilized and implanted Damon's eggs into St. Mary so that both women would be "related" to the child. But Damon testified that she and St. Mary orally agreed that St. Mary would be a mere surrogate. St. Mary further testified that she and Damon created the co-parenting agreement together, believing that it would be required by the fertility clinic as a prerequisite for the performance of the reproductive procedure. St. Mary indicated that despite the fertility clinic not asking for the agreement before the procedure, she and Damon completed the agreement after the procedure. Damon asserted that she and St. Mary did not intend to create an enforceable co-parenting agreement but created the agreement to satisfy the fertility clinic's requirements and to seek insurance coverage for the pregnancy.

Following the hearing, in March 2011, the district court issued an order providing that St. Mary was entitled to third-party visitation but not custody. The court reiterated that the scope of the evidentiary hearing had been limited to the issue of third-party visitation and noted that St. Mary could not be awarded custody of the child because previous orders determined that she "has no biological or legal rights whatsoever under Nevada law." Relying on NRS 126.045, which was repealed by the 2013 Legislature, the court also concluded that the co-parenting agreement was

null and void because under that statute "a surrogate agreement is only for married couples, which only include one man and one woman." *See* Nev. Stat., ch. 213, § 36, at 813 (repealing NRS 126.045). The 2011 order further provided that although St. Mary gave birth to the child, she "was simply a carrier for [the child]," and that she must "realize that [Damon] is the mother." As a result, St. Mary was granted third-party visitation rights and denied any rights as a legal mother. This appeal from the 2011 order followed.

## DISCUSSION

St. Mary argues that the district court erred in determining that, legally, she was a surrogate and not the child's legal mother and in deeming the co-parenting agreement unenforceable as a matter of law. As a result of our de novo review of these legal questions, we agree. *See State Indus. Ins. Sys. v. United Exposition Servs. Co.*, 109 Nev. 28, 30, 846 P.2d 294, 295 (1993) ("Questions of law are reviewed de novo.").

*St. Mary may be the child's legal mother*

To determine parentage in Nevada, courts must look to the Nevada Parentage Act, which is modeled after the Uniform Parentage Act (UPA). The Nevada Parentage Act is "applied to determine legal parentage." *Russo v. Gardner*, 114 Nev. 283, 288, 956 P.2d 98, 101 (1998). Absent an ambiguity, we focus on the statutory language and "give effect to the plain and ordinary meaning of the words." *Cromer v. Wilson*, 126 Nev. ___, ___, 225 P.3d 788, 790 (2010). Our ultimate goal in interpreting the Nevada Parentage Act "is to give effect to the legislature's intent." *Salas v. Allstate Rent-A-Car, Inc.*, 116 Nev. 1165, 1168, 14 P.3d 511, 513 (2000).

As the Legislature's adoption of the UPA recognizes, the relationship between a parent and a child is of fundamental societal and constitutional dimension. *Willerton v. Bassham, State, Dep't of Human Res.*, 111 Nev. 10, 19-20, 889 P.2d 823, 828-29 (1995) (explaining that the model act and Nevada's adoption of it were in response to constitutionally unequal treatment of children born out of wedlock and compelling social policies); *see also In re Parental Rights as to Q.L.R.*, 118 Nev. 602, 605, 54 P.3d 56, 58 (2002) (discussing the relationship between parental rights, society, and the United States Constitution). In Nevada, all of the "rights, privileges, duties and obligations" accompanying parenthood are conferred on those persons who are deemed to have a parent-child relationship with the child, regardless of the parents' marital status. NRS 126.021(3); *see* NRS 126.031(1) ("The parent and child relationship extends equally to every child and to every parent, regardless of the marital status of the parents."). Surrogates who bear a child conceived through assisted conception for another, on the other hand, are often not entitled to claim parental rights. *See* NRS 126.045 (2009) (defining "[s]urrogate" as "an adult woman who enters into an agreement to bear a child conceived through assisted conception for the intended parents," who are treated as the natural parents); 2013 Nev. Stat., ch. 213, §§ 10, 23, 27 at 807-08, 810-11 (replacing the term "surrogate" with "[g]estational carrier" and defining such as a woman "who is not an intended parent and who enters into a gestational agreement," wherein she gives up "legal and physical custody" of the child to the intended parent or parents and may "relinquish all rights and duties as the parent[ ] of a child conceived through assisted reproduction"); *Black's Law Dictionary* 1036 (8th ed. 2004) (defining surrogate as "[a] woman who carries out the gestational function and gives

Supreme Court
OF
Nevada

(O) 1947A

8

birth to a child for another"). Accordingly, whether St. Mary is treated as someone other than a legal mother, such as a surrogate, is of the upmost significance.

*The multiple ways to prove maternity*

Given the medical advances and changing family dynamics of the age, determining a child's parents today can be more complicated than it was in the past. To this end, although perhaps not encompassing every possibility, the Nevada Parentage Act provides several ways to determine a child's legal mother: a mother with a parent-child relationship with the child "incident to which the law confers or imposes rights, privileges, duties, and obligations." NRS 126.021(3). Under the pre-2013 and current versions of NRS 126.041(1), a woman's status as a legal mother can be established by "proof of her having given birth to the child." *See* NRS 126.041 (2009); 2013 Nev. Stat., ch. 213, § 34, at 812. In maternity actions under NRS Chapter 126, the statutes under which paternity may be determined apply "[i]nsofar as practicable." NRS 126.231. Paternity may be established in a variety of ways, including through presumptions based on marriage and cohabitation, NRS 126.051(1)(a)-(c), presumptions based on receiving the child into the home and openly holding oneself out as a parent, NRS 126.051(1)(d), genetic testing, NRS 126.051(2), and voluntary acknowledgment, NRS 126.053. Hence, a determination of parentage rests upon a wide array of considerations rather than genetics alone. *See Love v. Love*, 114 Nev. 572, 578, 959 P.2d 523, 527 (1998) (providing that the Nevada Parentage Act "clearly reflects the legislature's intent to allow nonbiological factors to become critical in a paternity determination").

This case presents a situation where two women proffered evidence that could establish or generate a conclusive presumption of maternity to either woman. St. Mary testified that she gave birth to the child, thereby offering proof to establish that she is the child's legal mother. *See* NRS 126.041(1) (2009); 2013 Nev. Stat., ch. 213, § 34, at 812. Damon showed that her egg was used to produce the child, demonstrating a genetic relationship to the child that may be a basis for concluding that she is the child's legal mother. *See* NRS 126.051(2) (providing a conclusive presumption that a man is the natural father upon unrebutted evidence of a genetic relationship between the father and the child); NRS 126.231 (stating that the statutes under which paternity may be determined apply "[i]nsofar as practicable" to maternity actions); *see also K.M. v. E.G.*, 117 P.3d 673, 678 (2005) (noting that, under a statutory scheme based on the UPA, evidence of genetic relationship could be a basis for a determination of maternity). By dividing the reproductive roles of conceiving a child, St. Mary and Damon each assumed functions traditionally used to evidence a legal maternal relationship. Hence, this matter raises the issue of whether the Nevada Parentage Act and its policies preclude a child from having two legal mothers where two women split the genetic and physical functions of creating a child.

*The law does not preclude a child from having two legal mothers*

When the district court apparently referenced the 2009 birth certificate order to conclude that Damon's status as the exclusive legal and biological mother was determined and that, as a result, it would not consider St. Mary's assertions of maternity or custody at the evidentiary hearing, it impliedly operated on the premise that a child, created by artificial insemination through an anonymous sperm donor, may not have

two mothers under the law.[2]   However, contrary to this premise, the Nevada Parentage Act and its policies do not preclude such a child from having two legal mothers.

Although NRS 126.051(3) contains procedures for rebutting paternity presumptions by clear and convincing evidence or "a court decree establishing *paternity* . . . by another *man*," (emphases added), and while NRS 126.051(3) arguably applies in maternity cases, we decline to read this provision of the statute as conveying clear legislative intent to deprive a child conceived by artificial insemination of the emotional, financial, and physical support of an intended mother who "actively assisted in the decision and process of bringing [the child] into this world." *In re T.P.S.*, 978 N.E.2d 1070, 1077 (Ill. App. Ct. 2012).   In Nevada, as in other states, the best interest of the child is the paramount concern in determining the custody and care of children.   *See* NRS 125.480(1) (in custody disputes, the child's best interest is the "sole consideration of the court"); NRS 125.500(1) (allowing custody to be awarded to a nonparent if "an award of custody to a parent would be detrimental to the child and the award to a nonparent is required to serve the best interest of the child"); NRS 127.150(1) (providing that the court may grant adoption upon finding that it is the child's best interest); NRS 128.105 (providing that a parent-

---

[2]Before being repealed in 2013, NRS 126.061(2) provided that a sperm donor was treated as if he were not the child's legal father, at least when that sperm is used to artificially inseminate a married woman. Under the 2013 version of NRS Chapter 126, a sperm donor "relinquishes all present and future parental . . . rights and obligations to any resulting child." 2013 Nev. Stat., ch. 213, § 6, at 806.

child relationship may be severed upon findings of parental fault and that such severance would serve the child's best interest). Both the Legislature and this court have acknowledged that, generally, a child's best interest is served by maintaining two actively involved parents. *See Mosley v. Figliuzzi*, 113 Nev. 51, 62-65, 930 P.2d 1110, 1117-18 (1997). To that end, the Legislature has recognized that the children of same-sex domestic partners bear no lesser rights to the enjoyment and support of two parents than children born to married heterosexual parents. *See* NRS 122A.300(1) (indicating that NRS Chapter 125 applies to registered domestic partners terminating their relationship); NRS 122A.300(3)(b) (recognizing former domestic partners' custody agreements). Certainly, the Legislature has not instructed that children born to unregistered domestic partners bear any less rights to the best-interest considerations set forth in these statutes than children born to registered domestic partners, married persons, and unmarried persons. Ultimately, "the preservation and strengthening of family life is a part of the public policy of this State." NRS 128.005(1).

Of the jurisdictions that have addressed the issue of maternity between two women who created a child through assisted reproduction, California is highly instructive. California, like Nevada, enacted statutes modeled after the UPA. *See K.M.*, 117 P.3d at 678. The California Supreme Court has determined that its laws do not preclude two women from being the legal mothers of a child. *See Elisa B. v. Superior Court*, 117 P.3d 660, 666 (Cal. 2005) (providing that, under the California UPA, there is "no reason why both parents of a child cannot be women"); *see also K.M.*, 117 P.3d at 675. In *K.M.*, the California Supreme Court dealt with a maternity case that presented facts analogous to the instant case. There,

K.M.'s eggs were implanted in E.G., her lesbian partner who gave birth to twins. 117 P.3d at 676. Thereafter, K.M. and E.G.'s relationship ended, and K.M. sought custody and visitation of the twins, but the trial court denied her request, determining that she had relinquished her parental rights. *Id.* at 677. On appeal, the California Supreme Court agreed with K.M.'s contention that she was the twins' legal mother because her eggs were used for the twins' birth. *Id.* at 678. It concluded that because "K.M.'s genetic relationship with the twins constitutes evidence of a mother and child relationship under the UPA," and "[t]he circumstance that E.G. gave birth to the twins also constitutes evidence of a mother and child relationship[,] . . . both K.M. and E.G. are mothers of the twins under the UPA." *Id.* at 680-81. The court held that when a woman provides her eggs to her lesbian partner so that the partner can bear children by in vitro fertilization, both women are the child's legal mothers. *Id.* at 675.

California's precedent is highly persuasive because it pertains to a statutory scheme that is substantially similar to Nevada's and advances the policies that underlie the Nevada Parentage Act—preventing children from "becom[ing] wards of the state," *Willerton v. Bassham, State, Dep't of Human Res.*, 111 Nev. 10, 20, 899 P.2d 823, 829 (1995), minding a child's best interest, *see* NRS 125.480(1); NRS 125.500; NRS 127.150; NRS 128.105, and serving a child's best interest with the support of two parents. *See Mosley*, 113 Nev. at 62-65, 930 P.2d at 1117-18. As other jurisdictions have acknowledged, recognizing two legal parents, such as two legal mothers, supports these policies. *See, e.g., Elisa B.*, 117 P.3d at 669 (concluding that a woman was a legal mother with an obligation to pay child support to her former lesbian partner; although the woman was not a genetic or gestational mother, she held the children out as her own,

and concluding otherwise "would leave [the children] with only one parent and would deprive them of the support of their second parent"); *Chatterjee v. King*, 280 P.3d 283, 292 (N.M. 2012) (explaining that a child can have two legal mothers under the New Mexico UPA because "the state has a strong interest in ensuring that a child will be cared for, financially and otherwise, by two parents"); *Miller-Jenkins v. Miller-Jenkins*, 912 A.2d 951, 970 (Vt. 2006) (determining that two women were both legal mothers of a child where, among other things, concluding otherwise "would leave [the child] with only one parent").

Hence, there is no legal or policy-based barrier to the establishment under NRS Chapter 126, as it existed at the time of the district court's determinations and as it exists now, of a legal parent and child relationship with both St. Mary and Damon. Rather, the Nevada Parentage Act and its policies permit a child created by artificial insemination, where one woman had her egg fertilized by a sperm donor and implanted into her female partner, to have two legal mothers.

Nonetheless, the district court determined that St. Mary was not the child's legal mother. The court appears to have grounded this conclusion on the 2009 order, which provided that Damon was the child's legal mother and required Damon's name to be added to the child's birth certificate. But while that order stated that Damon was "the biological and legal mother" of the child, it in no way purported to undo or deny St. Mary's parent-child relationship with the child. The order did not require the removal of St. Mary's name from the birth certificate or provide that St. Mary was not the child's legal mother. Rather, it acknowledged Damon's relationship with the child without denying the same of St. Mary. Moreover, whether St. Mary had rights to the child was not an issue that

Damon's 2009 petition sought to resolve because it requested that "maternity be established" and "[t]hat the birth certificate be amended to add the biological mother's name of . . . D[amon]."

Further, the district court's finding that St. Mary was a mere surrogate went beyond the limited scope of the hearing, which the district court prefaced by confirming that it would not consider parentage. Because this argument was not resolved by the 2009 order or any other prior determination, and since the Nevada Parentage Act did not bar a consideration of the evidence regarding St. Mary's claims for maternity and custody rights, the district court erred in refusing to consider the parentage issue and limiting the scope of the evidentiary hearing based on its conclusion that St. Mary was a surrogate—which was a conclusion that was made without an evidentiary hearing on that issue.

St. Mary asserts that she is a legal mother of the child in addition to Damon, not instead of Damon. This claim must be given consideration under the Nevada Parentage Act, which does not preclude the child from having two legal mothers. Because the district court erroneously concluded that St. Mary was a mere surrogate and limited the scope of the evidentiary hearing to third-party visitation issues, the district court did not consider the parentage statutes with respect to St. Mary's and Damon's testimonies regarding their intent in creating the child and the nature of their relationship to one another and the child. Although St. Mary's parentage can be established by virtue of her having given birth to the child, see NRS 126.041(1) (2009); 2013 Nev. Stat., ch. 213, § 34, at 812, the parties dispute whether they intended for St. Mary to be the child's parent or simply a surrogate or gestational carrier who lacked a legal parent-child relationship to the child. Therefore, upon

remand, the district court must hold an evidentiary hearing to determine whether St. Mary is the child's legal mother or if she is someone without a legal relationship to the child, during which the court may consider any relevant evidence for establishing maternity under the Nevada Parentage Act.

*The co-parenting agreement was not a surrogacy agreement and was consistent with Nevada's public policy*

St. Mary asserts that the co-parenting agreement demonstrates the parties' intent regarding parentage and custody of the child and that the district court erred in determining that the co-parenting agreement was an unenforceable surrogacy agreement under NRS 126.045. Damon responds that, because the agreement was between an unmarried intended parent and a surrogate and purported to resolve issues of parentage and child custody, the district court correctly deemed that the co-parenting agreement was prohibited by NRS 126.045 (2009).

At the time of the district court's determinations, NRS 126.045 (2009) governed contracts between two married persons and a gestational carrier, or surrogate, for assisted reproduction. It required such contracts to specify the parties' rights, including the "[p]arentage of the child," the "[c]ustody of the child in the event of a change of circumstances," and the "respective responsibilities and liabilities of the contracting parties." NRS 126.045(1)(a)-(c) (2009). Additionally, the statute defined a "[s]urrogate" as "an adult woman who enters into an agreement to bear a child conceived through assisted conception for the intended parents," and "[i]ntended parents" were defined as "a man and woman, married to each other," who agree to "be the parents of a child born to a surrogate through assisted conception." NRS 126.045(4)(b), (c) (2009). Here, St. Mary and

Damon's co-parenting agreement was not within the scope of NRS 126.045. The agreement lacked any language intimating that St. Mary acted as a surrogate, such as language indicating that she surrendered custody of the child or relinquished her rights as a mother to the child. Rather, the agreement expressed that St. Mary would share the parental duties of raising the child and would jointly make major parenting decisions with Damon.[3]

Nevertheless, Damon insists that, because the agreement covered issues of parentage and child custody, it necessarily addressed issues contemplated by NRS 126.045 and, as a result, is void for failing to meet the statute's other terms. In other words, Damon argues that outside of NRS 126.045, agreements (at least those with a non-parent) concerning parentage, custody, and responsibilities over a child are void. But, as explained above, parentage is governed by NRS Chapter 126. In the event that both parties are determined to be the child's parents, nothing in Nevada law prevents two parents from entering into agreements that demonstrate their intent concerning child custody.

---

[3]In 2013, the Legislature repealed NRS 126.045, substituted the term "surrogate" with "gestational carrier," and defined "[g]estational carrier" as one "who is not an intended parent and who enters into a gestational agreement" under which she "[s]urrender[s] legal and physical custody" of the child to the intended parent or parents and may "relinquish all rights and duties as the parent[ ] of a child." 2013 Nev. Stat., ch. 213, §§ 10, 23, 27, 36, at 807-08, 810, 813. The language of St. Mary and Damon's co-parenting agreement does not appear to be within the scope of this new statute.

"Parties are free to contract, and the courts will enforce their contracts if they are not unconscionable, illegal, or in violation of public policy." *Rivero v. Rivero*, 125 Nev. 410, 429, 216 P.3d 213, 226 (2009). It is presumed that fit parents act in the best interest of their children. *Troxel v. Granville*, 530 U.S. 57, 68 (2000). Thus, public policy favors fit parents entering agreements to resolve issues pertaining to their minor child's "custody, care, and visitation." *See Rennels v. Rennels*, 127 Nev. ___, ___, 257 P.3d 396, 399 (2011); *Rivero*, 125 Nev. at 417, 216 P.3d at 219 (permitting parents to create their own custody agreements, which are generally enforceable); *see also Rico v. Rodriguez*, 121 Nev. 695, 701, 120 P.3d 812, 816 (2005) (providing that a child's best interest is the primary concern in custody matters).

When a child has the opportunity to be supported by two loving and fit parents pursuant to a co-parenting agreement, this opportunity is to be given due consideration and must not be foreclosed on account of the parents being of the same sex. *See Kristine H. v. Lisa R.*, 117 P.3d 690, 696 (Cal. 2005) (stating that, in the context of a child being parented by two women, "public policy favor[s] that a child has two parents rather than one"); *E.N.O. v. L.M.M.*, 711 N.E.2d 886, 892-93 (Mass. 1999) (engaging in an analysis that indicated that a same-sex couple's co-parenting agreement could be enforceable insofar as it was in the child's best interest); *A.C. v. C.B.*, 829 P.2d 660, 663-64 (N.M. Ct. App. 1992) (finding that child visitation provisions of a co-parenting agreement between two women are enforceable if they are in the child's best interest). To bar the enforceability of a co-parenting agreement on the basis of the parents' genders conflicts with the Nevada Parentage Act's policies of

promoting the child's best interest with the support of two parents. *See Mosley v. Figliuzzi*, 113 Nev. 51, 62-65, 930 P.2d 1110, 1117-18 (1997).

St. Mary and Damon's co-parenting agreement was aligned with Nevada's policy of allowing parents to agree on how to best provide for their child. Within their co-parenting agreement, St. Mary and Damon sought to provide for their child's best interest by agreeing to share the responsibilities of raising the child, even if the relationship between St. Mary and Damon ended. The agreement's language provides the indicia of an effort by St. Mary and Damon to make the child's best interest their priority. Thus, in the event that St. Mary is found to be a legal mother, the district court must consider the parties' co-parenting agreement in making its child custody determination.

## CONCLUSION

The district court, in issuing its 2011 order, erred in determining that St. Mary lacked "legal rights" to the child because it misinterpreted the 2009 order, which recognized Damon's relationship to the child without affecting the same of St. Mary. The Nevada Parentage Act does not preclude St. Mary and Damon from both being legal mothers of the child. Hence, the district court abused its discretion in limiting the evidentiary hearing to the issue of third-party visitation. The district court also erred in deeming the co-parenting agreement unenforceable under NRS 126.045. The agreement's plain language indicated that it was not a surrogacy arrangement within the scope of that statute. Moreover, the parties' co-parenting agreement aligns with Nevada's policy of encouraging parents to enter into parenting agreements that resolve matters pertaining to their child's best interest.

As a result, we reverse the 2011 order. We remand this matter to the district court for further proceedings to determine the child's parentage, custody, and visitation.[4]

_____, J.
Saitta

We concur:

_____, C.J.
Pickering

_____, J.
Gibbons

_____, J.
Hardesty

_____, J.
Parraguirre

_____, J.
Douglas

_____, J.
Cherry

[4]In light of this opinion, we decline to address St. Mary's remaining arguments. We note that, as addressed in the parties' supplemental briefs, upon remand, it may be necessary to join the child as a party to this action under NRS 126.101(1).