**133 Nev., Advance Opinion 32**

IN THE SUPREME COURT OF THE STATE OF NEVADA

| | |
|---|---|
| KEN NGUYEN,<br>Appellant,<br>vs.<br>ROBERT BOYNES,<br>Respondent. | No. 69166 |

**FILED**

JUN 22 2017

ELIZABETH A. BROWN
CLERK OF SUPREME COURT
BY_____
CHIEF DEPUTY CLERK

Appeal from a district court order establishing paternity and child custody. Eighth Judicial District Court, Family Court Division, Clark County; Bill Henderson, Judge.

*Affirmed.*

McFarling Law Group and Emily M. McFarling, Las Vegas,
for Appellant.

Pecos Law Group and Bruce I. Shapiro and Jack W. Fleeman, Henderson,
for Respondent.

_____

BEFORE THE COURT EN BANC.

*OPINION*

By the Court, PARRAGUIRRE, J.:

In this case, we consider whether the district court erred in granting respondent Robert Boynes (Rob) paternity over a child adopted by appellant Ken Nguyen. We hold that the district court did not err in granting Rob paternity under the equitable adoption doctrine. In addition, we consider whether the district court's order violated the United States

17-20699

and Nevada Constitutions' equal protection clauses and conclude that it does not. Lastly, we hold that there is substantial evidence to support the district court's order granting Rob joint legal and physical custody. Accordingly, we affirm the district court's order granting Rob paternity and joint legal and physical custody over the child.

## FACTS AND PROCEDURAL HISTORY

Ken and Rob dated from November 2009 to May 2013. At some point during the relationship, a decision was made to adopt a child. In 2012, the parties sought adoption services from Catholic Charities of Southern Nevada (Catholic Charities). At the time, Catholic Charities disallowed joint adoptions for same-sex couples, and as such, Rob testified that Ken would adopt the child first and Rob would later also adopt the child.

In July 2012, Rob and Ken attended an orientation at Catholic Charities, and Rob used his personal email address to sign up for an adoption account with Catholic Charities. Both parties participated in every step of the adoption process, including the background check, post-placement visits, and adoption classes. Ken paid for the adoption fees. In February 2013, Catholic Charities notified Ken that it was placing a child with him for adoption. Both parties were present to receive the newborn child.

In March 2013, Ken's coworkers threw him a baby shower, which was held at Rob's house. Most of the congratulatory cards from the guests were addressed to both Rob and Ken. Two months later, the child was baptized at the Desert Spring United Methodist Church. Pastor David Devereaux performed the baptism with both parties present. The baptism certificate lists both parties as the fathers of the child.

In May 2013, the parties ended their relationship. Around this time, Rob asked Ken to add his name to the child's birth certificate, and Ken refused. In October 2013, Ken formally adopted the child. Both parties sat at the plaintiff's table during the adoption hearing, and Ken reiterated once again that he would not place Rob's name on the child's birth certificate, nor would he allow a second-parent adoption.

Since the child's first day of placement with Ken, he has primarily been under Rob's care. The child stayed overnight at Rob's house during the first night of placement and continued to do so for more than a month. Thereafter, the child would stay with Rob during the weekdays and with Ken during the weekends. After two months of placement, Ken decided to hire a neighbor to act as a full-time babysitter for the child. The neighbor took care of the child for two to four weeks before the parties returned to their previous arrangement for the child, which continued until May 2014, when Ken enrolled the child in daycare. Rob primarily took the child for doctor visits and provided most of the baby supplies. Additionally, in November 2013, Rob took the child to North Carolina to visit Rob's sister during Thanksgiving.

In May 2014, Rob filed a petition for paternity and custody. The district court issued an order holding, *inter alia*, that (1) Rob was entitled to a presumption of paternity under NRS 126.051(1)(d), and (2) Rob and Ken were to have joint legal and physical custody of the child. Ken now appeals the district court's order.

## DISCUSSION

On appeal, Ken argues, *inter alia*, that (1) the district court erred in granting Rob paternity under the equitable adoption doctrine, (2) the district court's order violated the United States and Nevada

Constitutions' equal protection clauses, and (3) the district court erred in granting Rob joint legal and physical custody.

*The district court did not err in granting Rob paternity*

The district court applied the doctrine of equitable adoption and held that Rob is the adoptive father of the child. Ken argues that the district court erred in applying the doctrine to the present matter because this court has limited the application of the doctrine to child support disputes, and that even if the doctrine does apply in this context, there was no clear intent for Rob to adopt the child to support an equitable adoption. We disagree.

*The doctrine of equitable adoption applies in this case*

A district court's application of the equitable adoption doctrine is a question of law that we review de novo. *See Rennels v. Rennels*, 127 Nev. 564, 569, 257 P.3d 396, 399 (2011) ("[W]e will review a purely legal question de novo." (internal quotation marks omitted)).

In *Frye v. Frye*, this court defined equitable adoption as an equitable remedy to enforce an adoption agreement under circumstances "where there is a promise to adopt, and in reasonable, foreseeable reliance on that promise a child is placed in a position where harm will result if repudiation is permitted." 103 Nev. 301, 303, 738 P.2d 505, 506 (1987). In that case, a husband promised to adopt his wife's daughter from a previous marriage. *Id.* at 301-02, 738 P.2d at 505-06. In doing so, the husband filed a petition to terminate the parental rights of the child's natural father, which the district court granted. *Id.* at 302, 738 P.2d at 505. The wife joined in the petition "but testified that she would not have done so had [the husband] not promised to adopt the child." *Id.* Thereafter, the husband and wife's "marriage deteriorated and the legal adoption was not finalized." *Id.* The husband filed for divorce, and

although he never formally adopted the child, the district court held that child support "was justified on a theory of equitable adoption." *Id.*

This court affirmed the district court and held that the husband clearly evinced an intent to adopt the child, which "was accompanied by a promise." *Id.* at 302, 738 P.2d at 506. Indeed, we explained that "[i]f [the husband] were allowed to renege with impunity, it would be to the probable detriment of an innocent child, whose present situation is the result of justifiable reliance on the promise that a new father would replace the old." *Id.*

However, we have since declined to extend the application of the equitable adoption doctrine to the facts of two cases. *See Russo v. Gardner*, 114 Nev. 283, 956 P.2d 98 (1998); *Hermanson v. Hermanson*, 110 Nev. 1400, 887 P.2d 1241 (1994). In *Hermanson*, the parties married when the wife was six months pregnant. 110 Nev. at 1401, 887 P.2d at 1242. Eventually, the wife filed for divorce, and the husband subsequently filed a motion requesting to be the child's de facto father, even if he was not biologically related. *Id.* at 1402, 887 P.2d at 1243. Thereafter, the parties disputed whether the husband was the biological father of the child, and the district court "referred the parties to a paternity hearing master with direction to order blood tests." *Id.* The blood tests revealed that the husband was not the biological father of the child. *Id.*

Despite the blood test result, the district court granted the husband's motion, and held that the doctrine of equitable estoppel barred the wife from denying that the husband was the child's father. *Id.* This court reversed, holding that equitable estoppel did not apply to the facts of that case. *Id.* at 1406, 887 P.2d at 1245. In particular, this court explained "that the doctrine of estoppel is grounded in principles of

fairness" but was used by the district court "to unjustly deprive [the wife] from disputing *the presumption of paternity*." *Id.* (emphasis added). Moreover, this court concluded that "the doctrine of equitable adoption enunciated in *Frye* . . . [was] inapplicable" to determine paternity. *Id.*

Similarly, in *Russo*, the respondent petitioned for joint legal and primary physical custody of his girlfriend's son, despite having no biological relation to the child. 114 Nev. at 285, 956 P.2d at 99. The district court granted the petition and concluded that the respondent had equitably adopted the child as a putative father pursuant to *Frye*. *Id.* at 286, 956 P.2d at 100. This court reversed the district court's order and reiterated that the equitable adoption doctrine was "inapplicable for determining legal parentage in a custody proceeding." *Id.* at 288, 956 P.2d at 101. Instead, this court examined the Nevada Uniform Parentage Act and held that the paternity statutes were controlling in "determining legal parentage in a custody dispute between biological and non-biological parents" under the facts of that case. *Id.* at 289, 956 P.2d at 102.

Thus, in *Hermanson* and *Russo*, this court declined to extend the equitable adoption doctrine to determine legal parentage between a biological and nonbiological parent, specifically where a putative father's biological relation with a child is in dispute. *Russo*, 114 Nev. at 287-89, 956 P.2d at 101-02; *Hermanson*, 110 Nev. at 1405, 887 P.2d at 1245. Instead, this court held that a determination of parentage as to whether a putative parent is the natural parent of the child falls within the purview of Nevada's Uniform Parentage Act. *Russo*, 114 Nev. at 288-89, 956 P.2d at 101-02; *Hermanson*, 110 Nev. at 1406, 887 P.2d at 1245.

Unlike *Hermanson* and *Russo*, this case concerns whether there was an agreement by the parties to adopt the child together that

was formed at the beginning of the adoption process, and whether accompanying that agreement was an intent and promise by Ken to allow Rob to adopt the child second due to Catholic Charities' policy disallowing joint adoptions for same-sex couples. The parties do not dispute their nonbiological relations with the child, and Nevada's Uniform Parentage Act is not implicated. We thus conclude that the equitable adoption doctrine is applicable to enforce an adoption agreement under the unique factual circumstances of this case. *See St. Mary v. Damon*, 129 Nev. 647, 655, 309 P.3d 1027, 1033 (2013) ("Ultimately, the preservation and strengthening of family life is a part of the public policy of this State." (internal quotation marks omitted)).

*The district court did not abuse its discretion in granting Rob paternity under the equitable adoption doctrine*

We further conclude that the district court did not err in granting Rob paternity through equitable adoption of the child. In particular, the district court held that the facts of this case satisfy the four elements in *Frye*, which are: (1) intent to adopt, (2) promise to adopt, (3) justifiable reliance, and (4) harm resulting from repudiation. 103 Nev. at 302, 738 P.2d at 506. We agree and review each element in turn.

This court reviews matters of parentage for an abuse of discretion. *See id.* at 303, 738 P.2d at 506. "The district court's factual findings . . . will be upheld if not clearly erroneous and if supported by substantial evidence." *Ogawa v. Ogawa*, 125 Nev. 660, 668, 221 P.3d 699, 704 (2009). "Substantial evidence is evidence that a reasonable mind might accept as adequate to support a conclusion." *In re Estate of Bethurem*, 129 Nev. 869, 876, 313 P.3d 237, 242 (2013) (internal quotation marks omitted).

First, substantial evidence supports the district court's finding that the parties intended for Ken to adopt the child first and Rob second, and that intent was accompanied by a promise from Ken to allow Rob to do so. Rob was an integral factor in the child's adoption and was intimately involved with the adoption process.[1] Nikolos Hulet, the then-manager of adoption services for Catholic Charities, and Brad Singletary, the then-director of adoption services for Catholic Charities, both testified that they believed the parties were participating in the adoption process together. Nikolos also testified that Rob participated in every step of the adoption process, including the background check, post-placement visits, orientation, and adoption classes. Additionally, Rob drafted the birth mother letter,[2] which contained pictures of him and his family. The letter stated that "we go to bed each night dreaming of the day we awake as fathers."

Moreover, Ken treated Rob as a second parent to the child before the commencement of the underlying suit. Both parties were present to receive the child for placement, and the child stayed at Rob's house during the first night. Further evidence of Ken's treatment of Rob

---

[1]Although Rob was not included on the child's birth certificate during the finalization of his adoption, Catholic Charities did not allow same-sex couples to participate in joint adoptions and required separate adoptions for each parent. Furthermore, the district court found that the deterioration of Ken and Rob's relationship during the summer of 2013 seemed to be the driving factor in Ken's decision to not follow through with the second adoption for Rob. We conclude that substantial evidence supports this finding.

[2]A birth mother letter serves to inform and assist birth parents with the selection of adoptive families.

as a second parent include: numerous text messages sent by Ken that referred to Rob as a dad, the child's middle name is Rob's surname, and the certificate of baptism for the child listed Rob as one of the parents. Rob was also regarded as a father to the child by others. Zhanna Killian, a nurse practitioner, testified that Rob brought the child to his medical appointments without Ken during a majority of the visits and that he appeared to be a loving father. Pastor Devereaux of the United Methodist Church also testified that both parties were acting as the child's parents. Additionally, a majority of the baby shower cards received during the child's baby shower were designated to both parties.

Second, substantial evidence supports the district court's finding that Rob justifiably relied on Ken's promise to allow him to adopt second and that Rob acted upon the promise to his detriment. *See Lubbe v. Barba*, 91 Nev. 596, 600, 540 P.2d 115, 118 (1975) (providing that in the context of tort law, justifiable reliance must result in the "inducement of the plaintiff to act, or to refrain from acting, to his detriment" (internal quotation marks omitted)). As discussed above, Rob dedicated a substantial amount of his time to the adoption process. Moreover, Rob primarily cared for the child post-placement. The child primarily stayed at Rob's house during placement and post-adoption, and Rob provided most of the baby supplies. Rob also made substantial changes to his house and lifestyle to accommodate the child's needs, which included changing one of the rooms in his house to a nursery.

Finally, the resulting harm from Ken's repudiation would be the deprivation of Rob's emotional and financial support to the child. *See St. Mary*, 129 Nev. at 655, 309 P.3d at 1033 ("Both the Legislature and this court have acknowledged that, generally, a child's best interest is

served by maintaining two actively involved parents."). As such, "[i]f [Ken] were allowed to renege with impunity, it would be to the probable detriment of an innocent child," and "[e]quity cannot allow such a result." *Frye*, 103 Nev. at 302, 738 P.2d at 506. Accordingly, we affirm the district court's application of the equitable adoption doctrine and grant of paternity to Rob.[3]

*The district court's order did not violate the United States and Nevada Constitutions' equal protection clauses*

Ken argues that the district court granted Rob parental rights because the parties were a same-sex couple, and a court has never granted parental rights to a heterosexual person similarly situated to the facts of this case. "The right[ ] to equal protection . . . [is] guaranteed by the Fourteenth Amendment of the United States Constitution and . . . Article 4, Section 21 of the Nevada Constitution." *Rico v. Rodriguez*, 121 Nev. 695, 702-03, 120 P.3d 812, 817 (2005).

---

[3]Ken also argues that the district court erred by granting Rob paternity pursuant to NRS 126.051 or ordering third-party visitation rights in the alternative. However, because we affirm the district court's order granting Rob paternity, we decline to address these arguments. *See First Nat'l Bank of Nev. v. Ron Rudin Realty Co.*, 97 Nev. 20, 24, 623 P.2d 558, 560 (1981) ("In that our determination of the first issue is dispositive of this case, we do not reach the second issue.").

In addition, Ken argues that the district court's factual findings in this matter are predominately contrary to the evidence presented and clearly erroneous. We hold that substantial evidence supports the district court's material, factual findings, and to the extent there was error, it was harmless error. *See* NRCP 61; *see also Wyeth v. Rowatt*, 126 Nev. 446, 465, 244 P.3d 765, 778 (2010) (providing that "the movant must show that the error affects the party's substantial rights so that, but for the alleged error, a different result might reasonably have been reached").

"The threshold question in [an] equal protection analysis is whether a statute effectuates dissimilar treatment of similarly situated persons." *Id.* at 703, 120 P.3d at 817. "In analyzing alleged equal protection violations, the level of scrutiny that applies varies according to the type of classification created." *Id.* However, "where a law contains no classification or a neutral classification and is applied evenhandedly, it may nevertheless be challenged as in reality constituting a device designed to impose different burdens on different classes of persons." *Id.*

Here, Ken does not challenge the constitutionality of a particular statute; rather, he alleges generally that the district court treated the parties differently than it would have a heterosexual couple. However, "[c]hild custody determinations are by necessity made on a case-by-case basis," and, here, "there is nothing to indicate that the ultimate decision of the district court turned on [the couple's sexual orientation]." *Id.* at 704, 120 P.3d at 817. Thus, we hold that the district court did not violate the United States and Nevada Constitutions' equal protection clauses in granting its order of paternity and child custody.

*The district court did not abuse its discretion in granting Rob joint legal and physical custody*

Ken argues that the district court erred in awarding Rob joint legal and physical custody of the child because, in determining the best interest of the child pursuant to NRS 125.480(4),[4] the district court failed

---

[4]NRS 125.480(4)(f) provided that "[i]n determining the best interest of the child, the court shall consider and set forth its specific findings concerning, among other things . . . [, t]he mental . . . health of the parents." NRS 125.480 was repealed in 2015, 2015 Nev. Stat., ch. 445, § 19, at 2591, and reenacted in substance at NRS 125C.0035, 2015 Nev. Stat., ch. 445, § 8, at 2583-85.

 

to properly consider Rob's mental health.[5] During trial, both parties testified to receiving harassing emails and handwritten notes from a stalker before and after the child's adoption. However, Ken now alleges that Rob was the stalker, and that, since stalking is domestic violence pursuant to NRS 33.018(1)(e)(1),[6] there is a presumption against perpetrators of domestic violence having custody pursuant to NRS 125.480(5).[7] For the reasons set forth below, we conclude that Ken's argument is without merit.

"This court reviews the district court's decisions regarding custody . . . for an abuse of discretion." *Rivero v. Rivero*, 125 Nev. 410, 428, 216 P.3d 213, 226 (2009). "It is presumed that a trial court has properly exercised its discretion in determining a child's best interest." *Wallace v. Wallace*, 112 Nev. 1015, 1019, 922 P.2d 541, 543 (1996). Furthermore, the district court's factual findings will be upheld if not

---

[5]Although the district court considered all the enumerated factors of a child's best interest pursuant to NRS 125.480(4), Ken only challenges the district court's findings regarding Rob's mental health on appeal.

[6]NRS 33.018(1)(e)(1) provides that "[d]omestic violence occurs when a person commits one of the following acts against . . . any other person with whom the person has had or is having a dating relationship[:] . . . [s]talking."

[7]NRS 125.480(5) provided that "a determination by the court after an evidentiary hearing and finding by clear and convincing evidence that either parent or any other person seeking custody has engaged in one or more acts of domestic violence against . . . a parent of the child or any other person residing with the child creates a rebuttable presumption that sole or joint custody of the child by the perpetrator of the domestic violence is not in the best interest of the child." *See* NRS 125C.0035(5).

clearly erroneous and if supported by substantial evidence. *Ogawa*, 125 Nev. at 668, 221 P.3d at 704.

The district court's order of paternity and child custody found that (1) "[t]here was nothing noteworthy" in regards to the mental and physical health of both parties, (2) the single harassing email sent by Rob was not sufficient to create a showing of "obsessed stalking behavior," and (3) both parties "parented with no major incident even during the so-called cyber stalking period." We conclude that the district court's findings are supported by substantial evidence.

During trial, Ken's expert witness connected two email addresses to Rob's IP address, one of which was linked to an email that was sent to Ken's mom. Rob confessed to sending the email, and he explained that he had received the email from the stalker and forwarded it to Ken's mom under a different email address to hide his identity. Rob testified that he did this because he was upset with Ken at the time, and when Ken's mom called Rob to praise her son, he wanted her to see the stalker's email, which contained disparaging contents about Ken's promiscuity. No further emails were presented during trial. Furthermore, the testimonies of Ken and Rob indicate that both parties were able to adequately take care of the child in a joint effort despite the alleged harassing emails. Thus, we hold that substantial evidence supports the district court's determination that both parents were mentally fit to take care of the child and that it was unable to make a "huge logical leap" in determining that Rob stalked Ken based on nonexistent emails.

Ken also argues that Rob intentionally destroyed his computer and lied about the date of its destruction to avoid disclosing evidence of his stalking behavior contained on the computer, and that the district court

should have found such evidence willfully suppressed and deemed adverse to Rob. *See* NRS 47.250(3) (providing a rebuttable presumption "[t]hat evidence willfully suppressed would be adverse if produced"); *see also Bass-Davis v. Davis*, 122 Nev. 442, 448, 134 P.3d 103, 106 (2006) (providing that a party seeking the benefit of NRS 47.250(3)'s presumption must demonstrate "willful or intentional spoliation of evidence [with] the intent to harm another party through the destruction and not simply the intent to destroy evidence"). In particular, Ken argues that Rob's thumb drives contained photos that were transferred after Rob claims to have destroyed his computer,[8] and a photo of the child next to a monitor indicates that the computer was still in use after the discovery request date. The district court found that there was inconclusive evidence to support a spoliation claim against Rob. We conclude that substantial evidence supports the district court's findings.

First, Ken's expert witness examined two thumb drives owned by Rob and found folders containing photos. The metadata of the photos indicate that they were transferred around August 28, 2014, from a Windows-based personal computer. However, Rob testified that the thumb drives were used to transfer photos from his friends' computers to collect evidence in preparation of trial, which is why the metadata showed that the pictures were transferred from Windows-based personal computers. Furthermore, the dates in the metadata of the photos still precede the date of the discovery request, which was September 11, 2014.

---

[8]Rob claims to have destroyed the computer on or about August 5, 2014.

Second, Ken provided a photo of the child allegedly next to the monitor of Rob's computer. The parties attempted to calculate the date of the photo based on the child's approximated age. However, Rob testified that the child was around six months to a year old at the latest, which would indicate that the photo was taken around a year to six months before the discovery request.[9] Furthermore, the parties were unable to extract any useful information from the photo besides the fact that it is a picture of the child next to a monitor. Thus, we hold that the district court's finding that the two thumb drives and photo of the child were inconclusive evidence to support Ken's spoliation claim against Rob was not clearly erroneous and that the custody decision fell within the district court's sound discretion. Accordingly, we affirm the district court's order granting Rob joint legal and physical custody of the child.

## CONCLUSION

We hold that the district court did not err in granting Rob paternity under the equitable adoption doctrine. Furthermore, we hold that the district court's order did not violate the United States and Nevada Constitutions' equal protection clauses. Lastly, we hold that the district court did not abuse its discretion in granting Rob joint legal and

---

[9]The child was born in February 2013, and the discovery request regarding the preservation of emails was sent on September 11, 2014. Thus, if the child is one year old in the photo, then the photo would have been taken around February of 2014, which is approximately seven months before the discovery request.

physical custody. Accordingly, we affirm the district court's order granting Rob paternity and joint legal and physical custody over the child.

_____, J.
Parraguirre

We concur:

_____, J.
Douglas

_____, J.
Gibbons

_____, J.
Pickering

SUPREME COURT
OF
NEVAOA

(O) 1947A

STIGLICH, J., with whom CHERRY, C.J., and HARDESTY, J., agree, concurring:

I agree with the majority that the district court did not err in granting Rob paternity in the instant matter. However, I believe that the Nevada Parentage Act provides a more appropriate analysis in this case than the doctrine of equitable adoption.

In *St. Mary v. Damon*, this court clearly concluded that Nevada law does not preclude a child from having two mothers under the Nevada Parentage Act. 129 Nev. 647, 654, 309 P.3d 1027, 1033 (2013). This court noted that "the Legislature has recognized that the children of same-sex domestic partners bear no lesser rights to the enjoyment and support of two parents than children born to married heterosexual parents." *Id.* at 655, 309 P.3d 1033. Similarly, "the Legislature has not instructed that children born to unregistered domestic partners bear any less rights . . . than children born to registered domestic partners, married persons, and unmarried persons." *Id.* Accordingly, this court held that maternity could be proved by: (1) offering proof to establish that the appellant is the child's legal mother, such as giving birth to the child pursuant to NRS 126.041(1)(a); or (2) applying paternity statutes "insofar as practicable" under NRS 126.051. *Id.* at 653, 309 P.3d at 1032 (quoting NRS 126.231); *see also Love v. Love*, 114 Nev. 572, 578, 959 P.2d 523, 527 (1998) (concluding that the lack of a genetic relationship does not preclude a finding of paternity, as NRS 126.051 "clearly reflects the legislature's intent to allow nonbiological factors to become critical in a paternity determination").

Pursuant to *St. Mary*, if a presumption of parentage can apply to a woman in a same-sex relationship, there appears no reason why the provisions of NRS 126.051 cannot apply to a man in a same-sex relationship. Because Rob submitted ample evidence to support the presumption of parentage under NRS 126.051(1), I concur with the majority's holding affirming the decision of the district court, but on different grounds.

_____, J.
Stiglich

We concur:

_____, C. J.
Cherry

_____, J.
Hardesty